Filed 2/6/26  In re J.N. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re J.N. et al., Persons Coming Under the Juvenile Court Law.

---

SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,

    Plaintiff and Respondent,

v.

J.R.,

    Defendant and Appellant.

E086244

(Super.Ct.Nos. J303748 & J303749 & J303750)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Kristina M. Robb, Deputy County Counsel for Plaintiff and Respondent.

1

J.R. (Mother) appeals from the juvenile court's order terminating dependency proceedings involving three of her children and issuing exit orders to family court that vested custody of the children with their father, J.N. (Father), and denied Mother visitation pending filing of the matter in family court. The children, J.T. (born in June 2008), Ja.N. (born in July 2012) and Jv.N. (born in Dec. 2011; hereinafter Minors) are now ages 17, 13, and 12. Mother challenges only the court's denial of visitation. As we explain *post*, we affirm the juvenile court's order.

## FACTUAL AND PROCEDURAL HISTORY

Minors came to the attention of child welfare authorities in February 2025 when law enforcement arrested Mother at a restaurant for driving under the influence of methamphetamine and misdemeanor child endangerment. Minors had contacted Father to report that Mother had been acting "so strange" while driving them around, including claiming she "did not recognize some of her children." Minors did not see Mother "smoking drugs" on that occasion, but they had in the past, according to law enforcement's report on the matter to San Bernardino County Children and Family Services (CFS).

A social worker interviewed Minors. The eldest, J.T. reported that she and her siblings lived with Father and did not see Mother often, perhaps two or three days a month. J.T. did not feel safe with Mother. In Mother's care, her discipline practices included taking J.T.'s phone, but also turning off the power in the home. Mother also sometimes turned off the power and sat in her car. Mother drank two beers before the driving incident, when they went to pick up Jv.N. Mother said she did not recognize

2

Jv.N., though her daughter "was right in front of her." Other strange behavior included trying to force J.T. to take a DNA test, telling her she was not Mother's child. Mother's relationship with her boyfriend, J.H. (Boyfriend) was marred by domestic violence, and he did not like Minors. J.T. reported she was " 'sometimes scared of her mother.' " For J.T. to feel safe at Mother's home, Mother would "need to get help and not have [Boyfriend] there anymore."

Ja.N. also did not feel safe with Mother, including outside Mother's home. The driving incident lasted for hours, during which Mother told them they were going to the hospital for DNA tests to prove they were her children. Mother thought Boyfriend had "traded the kids in" for different ones. Ja.N. did not "recognize [Mother] as [his] mother." She was "acting differently." At home, Mother drank beer about half of the time Ja.N. visited. His sister told him Mother had been drinking the day of the driving incident. During the social worker's interview, Ja.N.'s face went from "fine" to "a look of devastation." He told the social worker that he had received a text from Father indicating Mother had "gotten custody back," apparently in ongoing proceedings, and Ja.N. was "fearful of what would happen."

The social worker's interview with Jv.N. had to be paused several times because the child "often" became physically upset. She trembled and shook, including to the point of hyperventilating when describing being driven around by Mother "for hours." Mother drove "at really fast speeds and almost got into car accidents." Mother was acting "weird," and Jv.N. was "really scared." She also did not feel safe at Mother's home. Mother yelled a lot at Minors, Boyfriend was often there, and Jv.N. described an

3

incident in which Boyfriend grabbed Mother by the hair and beat her head into a wall. Asked how she would feel about returning to Mother's care, Jv.N. began crying. She excused her tears because she was: " 'Just a little scared of what she might do to me, I just would not want to go back with her.' "

Minors' adult sister, P.T., expressed concern that her siblings were not safe in Mother's care. She described Mother as "paranoid 24/7." Mother would talk to "people in the vents" in her home; she believed there were cameras in the vents; that her cell phone had been hacked; and that Boyfriend would, referring to P.T. in an ambiguous statement, "put us up for men." Mother's paranoia became exacerbated at night. Mother had a recent history of homelessness. Mother admitted to drug use, and P.T. believed Mother needed alcohol treatment as well.

Father told the social worker that Mother had been calling him nonstop, "saying weird stuff." After a 10-year relationship, they had separated in 2019. He was the biological father of Minors Ja.N. and Jv.N., and had cared for J.T. since she was five months old, viewing her as his own. During the driving incident, Father tracked Jv.N.'s phone and could see them driving in circles for hours. He followed them, called Mother, and urged her to stop to let Minors use the bathroom and get food. When she did, he called 911. Mother admitted she was "buzzed" but claimed a neighbor was driving. It was unusual for her to pick Minors up, as Father had them in his care 90 percent of the time.

Mother appeared unannounced at CFS's offices a week after the driving incident. She was shaking in the reception area when she asked for a pen, which she had such a

4

"hard time giving . . . back" that concerns arose "something might be wrong," including that she was "going through withdrawals." Mother excused herself outside for 15 to 20 minutes and returned much calmer, which did not mitigate the concerns. In speaking to the social worker, Mother would stare, not respond at times, and questions had to be repeated or rephrased. Mother gave a convoluted account of the driving incident. She summarized that it ended at the "burger place" when "the cops arrived" and "tried to get her for a DUI and child endangerment," but, "at the station . . . they drop[ped] the charges." Mother stated she had never driven a vehicle under the influence of drugs or alcohol with her children in the car. She denied using alcohol or drugs at all, nor did she smoke cigarettes or vape.

A second incident prompted CFS to seek and obtain immediate protective custody warrants for Minors. Mother attempted to pick Minors J.T. and Jv.N. up from school, but law enforcement responded because Minors refused to go home with her. They reported "being fearful of [Mother] and her actions." All three minors "stated that they are afraid to go home with [her] due to [Mother] not acting normal anymore and they feel u[n]safe." Minors reported fear of both Mother and Boyfriend. Among their fears, Minors worried that Mother "will retaliate against them for talking to CFS and law enforcement." Ja.N. reported also that Mother had "slapped him in the face, which was totally out of character." Minors stated "they love their mother, but are scared to go stay with [Mother] until she gets help, because if she does not believe they are her children they are afraid of what she may do to them."

Minors also disclosed to the responding deputy that Mother was telling them "they were going to move to Mexico to live with a maternal aunt and that [Boyfriend] was talking about selling the[m]." Mother asserted to the social worker who had arrived at the scene that Boyfriend lived out of state, suggesting Minors had nothing to fear from him. She would not, however, provide his contact information. The social worker noticed two large circular bruises on Mother's upper thigh. Mother had previously denied domestic violence with Boyfriend, stating they "talk to avoid disagreements."

CFS filed petitions seeking the juvenile court's dependency protection. The grounds included as to Minors Ja.N. and Jv.N. failure to protect them from a serious risk of harm (§ 300, subd. (b)(1)) and abuse of a sibling (*id.*, subd. (j)). J.T.'s petition added in relevant part a lack of any provision for her support by her birth father (*id.*, subd. (g)).[1] At the detention hearing, the juvenile court ordered predisposition reunification services for Mother and maintained custody of Minors with Father, to whom Minors had been released.

CFS's report for the pending jurisdiction and disposition hearing summarized its further investigation. Father said he and Mother separated in 2020, and though she sought and obtained primary custody and child support at that time, Minors lived primarily with him. Mother lost her low-income housing and had been, according to Father, " 'a maybe once a month type of mom.' " Father gained full, but temporary emergency custody of Minors a in family court after the driving incident, but that court

---

[1] Initial allegations of sexual abuse of J.T. by her birth father appear to have been subsequently dismissed upon CFS's recommendation.

6

subsequently allowed reinstatement of the prior formal custody arrangement that allotted Father only weekends. Meanwhile, Mother ignored the juvenile court's intervening custody order in the dependency proceedings by initiating unauthorized contact with Minors. This included following Jv.N. during a field trip, requiring a teacher to escort the child back to school. With a knife in hand, Mother also banged on the windows at the paternal grandmother's home, demanding Minors. Father was concerned about Mother's statements that she would take Minors to Mexico.

J.T. corroborated her sister's account that Boyfriend dragged Mother by the hair. Food was scarce at Mother's home, where Minors ate mostly granola bars. Mother smoked, drank beer, and sometimes vaped in the car with Minors present, contrary to what Mother told CFS. J.T. said she would want to visit Mother when she's "better" and "more secure," but she did not feel safe in Mother's home. Nor did she trust Mother elsewhere, given that Mother often drove while intoxicated. Mother complained in texts to J.T. about " 'children brainwashed by the narc' " and sent her an " 'underground movement about CPS' " video. Mother's behaviors made J.T. feel unsafe.

Ja.N. also saw Boyfriend pull Mother's hair and slam her head. Ja.N. recounted the driving incident, including that Mother mentioned Mexico among other places. She would not let them out of the car for hours, even to use a restroom. Ja.N. was scared. He had seen Mother drink beer before and believed she drove while drinking. He wished "they could all live together if his mom didn't act the way she does." He believed he would want to visit Mother "when she's not 'like that.' "

7

Jv.N. recounted what she had said previously. She suspected Mother was using drugs or alcohol; she had heard Mother's and Boyfriend's arguments on the phone, and she did not like him because of his abuse, including when her sister tried to intervene and he (Boyfriend) pushed her sister.

Mother failed to show for her drug tests and put off the social worker's inquiries. Mother claimed she would call or text the worker back, but did not do so. Mother's criminal history included two separate alcohol DUI charges preceding her most recent arrest, as well as driving on a suspended license and multiple petty theft and obstruction charges.

The juvenile court continued the March 2025 jurisdiction and disposition hearing for Mother to be interviewed by the social worker, to no avail. The court ordered Mother to drug test that day. Mother complained about the test site's observation policy. She completed a negative test at a different location after the social worker learned Mother had been barred from the scheduled site. Mother thwarted attempts to interview her by demanding to record the social worker on multiple occasions and then escalating to yelling at the worker, resulting in termination of the call. Minors did not want to visit with Mother, nor does the record indicate Mother ever attempted approved visitation with them.

The court continued the late April 2025 jurisdiction and disposition hearing again to allow Mother to speak to the social worker. The court instructed Mother to call the worker after the hearing to set up an interview, which never happened. CFS's interim report summarized that the social worker reached out to Mother to schedule an

appointment in May 2025. Mother agreed to a date, but when the worker followed up to confirm the next day, Mother said she was out of town on business. Mother missed her drug tests in April and May.

CFS's further interim report included more details on Mother tracking Jv.N. on her field trip. Mother and Boyfriend were both at the field trip site, disheveled and seeming not to have slept. Minor had to warn Mother away and feared she would be kidnapped. A teacher stood "between [Jv.N.] and [Mother] and [Boyfriend] who insisted on holding [Minor]. Father had to change Minors' cell phone numbers to prevent Mother from contacting them outside of juvenile court supervision. CFS worried that Mother "clearly disregards the court orders and continues to scare [Minors] with her actions, placing them at continued risk." At an ensuing scheduling hearing with the attorneys, the court barred visitation with Mother until the next hearing.

The court held the jurisdiction and disposition hearing on June 2, 2025. CFS sought termination of the dependency with exit orders to family court to include supervised visitation for Mother. Minors' counsel opposed visitation.

Mother testified. She recounted her version of the driving incident, she denied not recognizing Minors, denied drinking alcohol, denied illicit substance use, explained her missed tests because her birthdate was incorrect on testing paperwork, denied any mental health issues, insisted that DNA testing of Minors was simply for tracing ancestry, and denied knowing Jv.N. would be at the field trip park the day Mother and Boyfriend also appeared there. Mother denied a current relationship with Boyfriend or that he had ever

9

hit or pushed her. But she admitted he drove her to court that day. Mother saw no reason for visitation with her children to be monitored.

The court found no credibility in Mother's testimony and that visits with Mother would be detrimental to Minors. The court amended the dependency petition allegations to reference Mother's erratic and bizarre, unregulated and unexplained behavior, but specified there had been no medical mental health diagnosis as yet. The court found dependency was nevertheless necessary, sustaining jurisdiction under section 300, subdivision (b), for Minors Ja.N. and Jv.N., and under subdivisions (b) and (g) for J.T. The court removed custody from Mother and found Father to be the presumed father of Minors and that he was able and willing to assume custody.

The juvenile court then dismissed the dependency with orders granting Father sole legal custody and primary physical custody of Minors. The court's exit orders to family court jurisdiction specified no visitation for Mother pending filing of the matter in family court within 15 days of the juvenile court's order. The juvenile court's no-visitation order included a handwritten notation and the following check marked reasons for the order: Mother had "not completed" (1) any drug abuse treatment program with random testing, (2) a domestic violence treatment program for victims, (3) anger management training, (4) parenting classes, (5) individual counseling, or (6) mental health services, including evaluation or medication compliance. The court's handwritten note specified as a further basis for its order: Mother's "complete lack of insight [and] self awareness" and that she "violates [the] children's personal[,] emotional[, and] safety boundaries."

10

## DISCUSSION

Mother contends the juvenile court erred in failing to require visitation for her in its exit orders. To recite the evidence above is to show there is no merit whatsoever to Mother's argument.

Mother relies on the principle that visitation is ordinarily an essential component of reunification services. She invokes Welfare and Institutions Code section 362.1, subdivision (a)(1)(A), which provides that *when* the juvenile court issues a dispositional order "placing a child in foster care, and ordering reunification services," the court generally must provide for parental visitation "as frequent[ly] as possible, consistent with the well-being of the child" (*ibid.*), without "jeopardiz[ing] the safety of the child" (*id.*, subd. (a)(1)(B)).[2] That is not the posture of this case, however. Foster care and reunification supervised by the juvenile court were not at issue.

Rather, as CFS points out, section 361.2 governs when there is a previously noncustodial parent able and willing to assume custody. Instead of sending a dependent child to foster care, the court "shall" place him or her with the parent willing to assume custody, unless it would be detrimental to the child. (§ 361.2, subd. (a).) In making these decisions in the child's best interests, the juvenile court may adjust legal and physical custody, terminate its dependency jurisdiction, and "*may* also provide reasonable visitation by the noncustodial parent." (*Id.*, subd. (b)(1), italics added; see, e.g. *In re*

---

[2] All further statutory references are to the Welfare and Institutions Code.

11

*Austin P.* (2004) 118 Cal.App.4th 1124, 1131.) Mother cites no authority that visitation is required in these circumstances.

To the contrary, as CFS also correctly explains, section 362.4 sets forth the governing framework when the juvenile court terminates jurisdiction and issues exit orders for custody and other matters to be monitored and adjudicated in the family court. (See *In re J.M.* (2023) 89 Cal.App.5th 95, 112-113.) Thus, as *J.M.* highlighted: "Section 362.4 governs the termination of juvenile court jurisdiction and related orders. The statute authorizes a juvenile court to make 'exit orders' regarding custody and visitation upon terminating dependency jurisdiction over a child. (See § 362.4, subd. (a); *In re Chantal S.* (1996) 13 Cal.4th 196, 203 . . .; *In re Kenneth S., Jr.* (2008) 169 Cal.App.4th 1353, 1358[.]) These exit orders remain in effect until modified or terminated by a subsequent order of the superior court. (§ 362.4, subd. (b); see also Cal. Rules of Court, rule 5.700.)" (*J.M.*, at p. 112.)

*J.M.* continued: " '[I]n making exit orders, the juvenile court must look at the best interests of the child.' [Citations.] The court must be guided by the totality of the circumstances and issue orders that are in the child's best interests. [Citations.] Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, '[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . . Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.' " (*J.M.*, *supra*, 89 Cal.App.5th at p. 112.)

We review the juvenile court's exit orders under the deferential abuse of discretion standard. (*J.M.*, *supra*, 89 Cal.App.5th at p. 113.) Under that standard, we will not disturb the juvenile court's decision " ' "unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) As the high court "warned" practitioners long ago: " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*Id.* at pp. 318-319.)

The juvenile court did not abuse its discretion. Mother's arguments shade the record in her favor, contrary to the standard of review. We review the record in the light most favorable to the juvenile court's determinations. (See, e.g., *In re. I.J.* (2013) 56 Cal.4th 766, 773.)

Mother's statements also approach misstatement of the record, as when counsel on her behalf asserts: "The children wished to have visits with Mother, even expressing the desire to return to her care *as her behavior improved*." (Italics added.) Mother's behavior never improved, and it misstates the record to imply it did. Counsel on Mother's behalf also argues: "There is no evidence that the children feared Mother or felt unsafe in her presence *during monitored or supervised visits*." (Italics added.) The record is devoid of evidence that Mother visited with Minors, monitored or unmonitored, except when she approached Jv.N. on her field trip outside of court-sanctioned visitation, and the child feared she would be kidnapped. Mother also routinely flouted court supervision by contacting Minors on their cell phones, until the numbers were changed. Minors were terrified of Mother. The juvenile court was not required to order an

13

experiment in finally having Mother abide by monitored visitation in the interlude between juvenile court and family court jurisdiction.

## DISPOSITION

The juvenile court's challenged exit orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>MILLER                              </u>
                                    J.

We concur:

<u>McKINSTER                    </u>
          Acting P. J.

<u>CODRINGTON              </u>
                    J.